Good morning and welcome to the second day of our sitting here in Jacksonville. We're very pleased to be here and hold court here this week. For the lawyers, we've familiarized ourself with your cases, so we urge you to go to your most important points without too much introduction. You won't waive anything that's in your briefs by not talking about it today. Appellants, your reserve time should be used as a true rebuttal to respond to your opponent's arguments. Please don't bring up new points that your opponent won't have a chance to respond to in your rebuttal. Our lighting system, you probably know the yellow light comes on when you have two minutes left in your allotted time, and when the red light comes on, we ask you to conclude your remarks unless you're answering a question from the court. All right, let's proceed. First case is St. Paul v. Rosen Hotels. May it please the court, your honors, and good morning. I'm Scott Goddess on behalf of the appellants, joined by Frank Jakes, my co-counsel, and Mark Minson, who is a business person at Millennium Technology Group. Your honors, we ask that the district court decision be reversed for one basic reason and a follow-up. Basic reason is there is indeed a duty to defend here. A claim, a written demand that seeks damages, triggers the policy language. Indeed, the district court recognized that it does, and St. Paul recognized that it could. So then the central question becomes, does the court apply a narrower interpretation or some exception to Florida law regarding the duty to defend in the Four Corners Rule, and does it apply a standard that's more similar to the duty to indemnify standard than one for the duty to defend? Beyond that, the position that St. Paul has taken that the corporate relationship between these two entities eliminates the duty to defend simply without basis in law or the policy language, or indeed how St. Paul has viewed these two parties previously. So regarding the duty to defend, again, the plain language of the claim here, which triggers the broader language of St. Paul Road compared to other insurance companies. Here's a question. You say the plain language is a claim, but there's not actually a claim yet as I understand it. Does the Four Corners test apply to demand letters rather than simply to complaints and lawsuits? Absolutely does, Your Honor. In fact, in terms of the demand itself, St. Paul's policy is broader than other general liability insurance policies. Most general liability insurance policies provide a defense only against suits, which typically is defined as litigation or an alternative dispute resolution or an arbitration proceeding to which the insurance company has agreed to cover or broaden it to include claims, which is, quote, a demand that seeks damages, which is what we have here. So the question in terms of does Florida law address the question, has it addressed the question of whether there's a duty to defend demand letters? The answer is yes. In 2017, the Florida Supreme Court in the Altman Contractors case decided that exact question under a policy that was narrower than the St. Paul insurance policy. One that covered only and also claims, demands that seek damages. So in that circumstance, Florida has unique rule regarding construction defects where it requires a homeowner to send a demand letter to the contractor saying, I've suffered damages and I ask you to fix it. Nothing more. The court considered, was that enough for a defense? Is that enough to trigger a suit under that general liability insurance policy? The court says yes, it does. And so it didn't require analysis beyond that. And so there is narrower language that the Florida Supreme Court in 2017 does indeed trigger a duty to defend. Here we have significantly broader language by St. Paul having sold policies that include a defense against suits. I have a different question about the demand letter. I don't see where the demand letter or the notice of claim, frankly, alleges any facts. And under Florida law, to trigger the duty to defend, the insurer has to allege facts that would fairly and potentially bring the claim within the policy coverage. Your Honor, I agree that's the standard and facts are what triggers coverage. And here the letter alleges what Millennium did. It alleges that it made private information known to third parties. It alleges why and how Millennium could be liable for a data breach or the violation of a credit card holder's right of privacy and alleges the damages. So we submit that the letter is indeed brief. It does submit and it does allege facts that are within coverage of the policy. Actually, the only argument that the insurance company makes about the Four Corners rule is that there are no facts to support Millennium itself having made the publication of a quote making known. But it seems to me it's absolutely clear that third-party hackers did this and that the Four Corners rule applies in the context of a demand that makes an assertion of that nature into what are the actual facts. Regarding the actual facts as to who published the information, we submit that that's a duty to indemnify standard, not under the Four Corners rule for the duty to defend. But beyond that, the record is that the hackers got into the server in question. And so it's absolutely clear though that Millennium did not make this information known to the public, is it not? Your Honor, in terms of the case going forward, the facts might illustrate as the FBI has said in the cases of cyber attacks, that Millennium may have put out information to the public, to hackers, to make information known. So for example, the FBI said in a cyber attack pretty frequently a message comes through that fools someone and asks them to put their information out, their private information out, to the hackers thinking that they're giving it out to an internal user. So the facts may indeed demonstrate that. The facts may further demonstrate that a Millennium computer actually broadcast the information, as one court ruled, in terms of putting information out there. So do we anticipate as the facts are developed that someone will say that Millennium wholeheartedly handed over the information to a hacker intentionally? Not likely. May the facts demonstrate that Millennium typed in information or gave away usernames or passwords? Perhaps. The FBI says that happens. Will Millennium's computers be demonstrated to have broadcast information, private information? Perhaps. But that's not on the record. That may be illustrated in terms of the duty to indemnify. So the Four Quarters Rule, the second part of Your Honor's question, really is one that works both ways. And so a strict application of that rule sometimes works in favor of insurance carriers and sometimes works in favor of policyholders. So for example, the DC Court of Appeals, the highest court in DC, in 2002 was asked to reconsider whether their version, the Eight Corners Rule, eight corners of the policy and eight corners of the policy, four corners of the complaint, should be thrown out and allow exceptions. Because the policyholder asserted that although the four corners of the complaint suggested a claim that was clearly squarely within an exclusion, that the insurance company knew or could have known that there were facts, the actual facts, take the claim outside of the exclusion and ask for the four corners rule to have exceptions. And the court said no, this is a clear, simple rule that gives certainty to insurance carriers and policyholders. And in that circumstance, the policyholder lost because the complaint was pleaded in a way, even though the facts were not correct, that took it outside of coverage. In applying that case, the District Court of DC said that what the insurance carrier, when I was asking for an exception the other way, could not have both sides of its bread buttered. And so this is a situation in which the claim pleads into coverage. Doesn't it seem like you want to have it both ways though? Because on the one hand, you're saying the facts could eventually show that Millennium itself actually revealed information. But on the other hand, you're saying there are enough facts in the current demand letter in order to meet the standard for the eight corners test. I'm not sure it can be both ways. Well, Your Honor, we respectfully, we're arguing it one way insofar as the claim itself has sufficient facts, we believe, we assert, to trigger the duty to defend. And then if the court were to look beyond that and try to establish and determine the true facts, which we submit as a duty to indemnify standard, that the facts may indeed support that. And so we're not asking the court to go beyond it for purposes of this analysis. But if the court were to do that, and the court were to apply some exception, we submit that there are, that the facts may ultimately illustrate enough to support a duty to defend beyond the four corners rule. But it's clear that the crucial issue in this case is whether or not this personal injury provision covers when third-party hackers do the publication. Is that not true? Your Honor, we submit that as a liability insurance policy, this really turns on the question of the liability of the policyholder. And so multiple courts... Let me ask my question. That's part of my question. In the liability, the normal negligence liability portions of this covered says so. It would be property damage, has to be tangible property. And the policy says tangible property does not include data. Therefore, it seems to me, and really the gist of the complaint here, is that Millennium failed, negligently failed to protect this data. That's the only intelligible claim. And it seems to me that would be a negligence claim that should fall, if at all, under the negligence provisions, which it clearly does not. How do you answer that? Your Honor, in terms of the policy, we agree that in terms of data itself is not covered under property damage. That being said, property damage section of the policy does include coverage for the loss of use of tangible property. And the basis for hotels liability and damages is the loss of use of and destruction and replacement of cards. And in terms of after the breach, they had to pay for the destroyed cards. They're not seeking coverage for loss of use of the data, destruction of data. They also lost the use of their own servers, which was part of the record that St. Paul established in discovery. But beyond that, in terms of the how does the personal offense and personal and advertising injury coverage apply, which is not necessarily dependent upon a finding of negligence. And the ultimate question in terms of does the policy require the purposeful affirmative acts of the policyholder to grant for coverage to apply, the answer is no. Because courts have gone, admittedly, both ways. Since Paul cited multiple cases, particularly in the pollution context, where courts were reluctant to give personal injury coverage to what really was a pollution claim because the policyholders realized there was no pollution exclusion for personal injury coverage. But some courts disagreed. So, for example, the Sixth Circuit back in 2004 answered this exact question, considering personal injury coverage, whether the policyholder had to have taken action and said, this language indicates, therefore, that what matters for purposes of determining coverage is the asserted liability of the insured, not whether it committed the wrongful acts. And just as significant, if not more so, is what the New York Supreme Court decided in Zurich versus Don Buchwald. And that's the same court that decided the Zurich versus Sony case on which the insurance industry says decides the entire issue. And in a question of whether a private tape of Hulk Hogan could be the basis for liability and coverage for the entertainment agents, the court said yes, because the argument lacks merit put against companies that they had to be the publishing party, because no such requirement is expressed in the policy. So, with respect to that crucial question of whether or not this personal injury category covers third-party publications, it's clear, as you're saying, that there's just a split of First place is sparse authority. Second place, it's split. And this is a pretty significant issue. Should we not certify that to the Florida Supreme Court? Your Honor, I see that I'm out of time. With the Court's indulgence, I'm happy to answer your question. We would be happy to have that certified to the Florida Supreme Court. In terms of the split, we also suggest that the Third Circuit addressed this question. The Third Circuit said, in interpreting this exact coverage in a different context, that a phrase which insurance companies have consistently refused to define, and that has generated literally hundreds of lawsuits with widely varying results, cannot, under our application of common sense, be termed unambiguous. Your Honor, I see that I'm out of time and I save the rest for rebuttal. Thank you. Good morning, Your Honors. Bear with me while I raise the podium. May it please the Court, Counsel, my name is Chuck Spivak and I represent St. Paul Fire and Marine Insurance Company. With me at counsel table is Joe Gagan, who wrote the brief. Judge Anderson actually framed the issue precisely with regard to what the answer is concerning whether the Four Corners rule in any way makes a difference to the outcome of this case, and whether the application of that rule in any way is the basis for a reversal of the trial court's decision. Judge Anderson is correct when he says that it's absolutely clear that whatever making known of private information was done in this case was not done by the insured. It was done by the third-party hackers, and thus we can talk about, as much as we want to, how many angels can dance on the head of the pen, whether a claim for construction defects somehow represents an exception to the fact that the Four Corners rules only applies to complaints or not, when we know that the Keene decision says that where there are undisputed facts known to all parties, that those facts can be taken into account by the court in determining the duty to defend as an exception to the Four Corners rule. And this court has specifically recognized that Keene exception in its decision of first specialty versus 633 partners. So in this case, Judge Anderson is correct. It's absolutely . . . He has just asked that question, and what he said was, well, Millennium might have typed in something on the computer that helped the hackers. Would that be a publication? If Keene was actively involved in the theft of the information and was a participant in having it being communicated to third parties, that would be no different than all the other cases that they cite where they say that you don't actually have to be the participant. If you're a co-conspirator in a conspiracy, you're deemed to have committed the acts of the co-conspirator. But that's not what . . . What about an unintentional act, say a phishing attack where an unintentional situation like that, Your Honor, does not make the insured responsible for the actual making known of the information? The argument in this case is that they failed to protect the information and that allowed someone to steal it. Well, if the policy only dealt with coverage for invading someone's right of privacy, we might have an argument here. But the policy goes farther than that and has a specific requirement, not just that it protects against privacy right invasions, but that it protects against publication or making known of material that results in a privacy right violation. And a failure to protect information or a failure to negligently protect passwords is not the same as actually making the information known. Here it was the act of a third party actors that made the information known. And that fact is the only extrinsic act that is undisputed between all the parties as to whether the evidence would eventually show that somehow Millennium participated actively in the criminal activity. That's the type of extrinsic evidence you absolutely cannot take into account under the Keene exception as accepted by this court in the First Specialty versus 633 Partners case. Oh, if all of that's true, we get to the text of this provision. And it seems to me, contrary to your argument that the plain language favors the you, it seems to me the plain language favors the insured. It says the language requires that the relevant quote personal injury be caused by one of the listed quote personal injury offenses. And it doesn't say that the damages for which the insured is liable or may be liable is quote caused by the quote making known or publication. Uh, and there's no requirement that the insured actually commit the act of publication. So why doesn't the plain language favor the insured and not you? But do respect Judge Anderson, you're to all the personal injury offenses that requires that the obligation to pay damages for covered personal injury result from the insured's business activities. The policy only this clearly resulted from the insured's business activities, whether the third party did it or or millennium. I mean, the I. T. Business wasn't that their business? Well, we do respect your honor. The making known the covered offense has to result from the insured's business activities. And in this case, the insured's business activities did not result in the making known. That was the act of the intervening third party hackers. It was the intervening third party hackers business activities that resulted in the cover defense taking place, not the activities of the insured. The failure to protect private information is very different than the making known of private information. The policy only covers amounts of protected person is legally required to pay as damages for covered personal injury that results from the insured's business activities and is caused by one of the defined personal injury offenses. In this case, the making known to any person organization covered material that violates a person's right of privacy. If it wasn't the purposeful acts undertaken by the insured or its agent that was required to trigger coverage, then the reference to the requirement that the damage result from the insured's business activities would be mere surpluses. And that's what the counsel aptly concluded, that the only plausible interpretation of this policy language is that it requires the insured to be the publisher of the private information and that to construe the policy to include the acts of third parties would be expanding coverage beyond that which was intended by the policy. How do you handle the Seventh Circuit Scottish right case that you know I'm not sure that the key here is intentional as opposed to who the actor has to be. And so Scottish right case doesn't say anything at all about the fact that it doesn't have to be the insured who's the actor. So I think we get off on a tangent by talking about intentional versus purposeful when the real question is who does the actor have to be. So what if what if it a Millennium employee printed out all the personal information of hotel guests in order to take it from one room to another and they dropped it and it you know various pieces of paper blew away. Would that be covered in your view? That in and of itself your honor would not be enough to tell us that the claim is covered. Now we know on the basis of some of the other decisions that are out there that for example the insured posting private information on a website would constitute the making known or publication of information because that information is available to the general public. If they drop the information in the middle of an airport and a bunch of strangers came by and picked it up then you would probably be able to say that they made known that information to third parties. If they dropped it in their own office that is just supposedly just as entitled to the same amount of security within their own office as is the data on their servers. And in that case there would only be the potential for liability of some third party picked up that information from a place they weren't supposed to have or from and then went out and published it in some other manner. So we're not saying in this case that the allegations against this insured aren't that it in some manner negligently allowed a third party to access this information. Whether it be on a server or whether it be left on at the end of the evening. What we're saying is that this policy doesn't cover simply claims for privacy right violations. It goes beyond that to say that the only type of privacy right violation that we're going to cover is in a situation where the insured makes known information that violates a person's right of privacy. So in this case we have to distinguish between how it was that information was accessed, which has nothing to do with this coverage, and how it was it was made known so as to result in a privacy right violation to a third party, which as Judge Anderson has pointed out was clearly the work of third party hackers independent of the insured, not insured under this insurance policy. I'm not sure that I'm understanding you. Are you saying that a this property, negligent IT systems that resulted in its publication on the front page of the New York Times, that would not be covered? Under this policy it wouldn't. And why? Why would it not? Because under that circumstance there's no proof and no indication that the reason that resulted on the New York Times cover was because the insured made it known to someone who then gave it to the public. The policy says that the insured has to do it. It seems to me the plain language of the policy says that if the publication happens, that is, and the damages are caused by the personal injury offense, in quotes, which is the publication, that is covered. And your answer to me a minute ago was, well that didn't arise out of the business of the insured. And I don't understand why it did not arise out of the business of the insured if it was a result of a negligent act on the part of the insured. Because your honor, the coverage grant doesn't just talk about the resulting invasion of someone's privacy right. So the question as a result isn't whether the invasion of the privacy right arose out of the insured's business activities. The coverage grant talks about the making known of information that results in violations of a person's right of privacy. And that activity has to arise or result from the insured's business activities. And there was nothing about the insured's business activities that resulted in its making known this information to third parties. Put another way, the alleged damage here resulted from the third-party hackers business activities in committing the cover defense, but not the insured's business activities in failing to allegedly properly safeguard the information that it thought it had secured on its servers. It seems to me the negligent act of the insured is an act in the course of its business activities. Again your honor, and I'm not ever going to agree, your honor is focusing on the fact that the negligent act somehow may have resulted in the course of their business activities and someone's privacy rights being violated. The insurance policy however does not just cover resulting privacy right violations. There's an intervening step that has to arise from the insured's business activities and that is the out at the beginning of your question. It is undisputed that it's not this insured or its business activities that made known the covered material that resulted in the privacy right violation. And I'm not the only one who says this. The end of that court said exactly the same thing and said that that's the only reasonable interpretation to be given this language, as did the Sony court. And by the way, with regard to the allegation that the same court that decided Sony has since backtracked on itself, read that case carefully because the case cited by Mr. Gattas is another one of these situations where the insured was engaged in a conspiracy. So as a co-conspirator, its liability was considered to be based upon exactly the same conduct as the third party. In this case, the fact that the insured may have been negligent in failing to protect material, absent co-conspiracy proof and allegations doesn't mean the insured was liable for it having been made known. In other words, the insured does not become liable for the acts of the third party. And this insurance policy is only triggered by the type of act that was committed by the third policy, by the third party. The same is true actually for every case of a site that says that the insured doesn't have to be the one who was involved. And the one I would point out specifically, because when I read, I say, wow, this concerns me a little bit, was the one where the person surreptitiously was filming women in the dressing room of the company. And the allegation that they claim in their brief was, well, they were negligent in failing to allow that to happen. Turns out, the person who did the filming was an employee of the company, had a title of vice president and the equipment that he used to do the filming was purchased by the company. Now that's a situation where the business activities of the company may have resulted in the violation of the privacy right. But in this case, the business activity of the company that is alleged to be at issue, the failure to protect data, isn't enough to trigger the claim necessary to invoke coverage. Because to invoke coverage, there has to be a making known of that private information. And if that was anyone's business activity, that was the business activity of the third-party hackers. Thank you, Your Honors. Thank you, Your Honors. In rebuttal, addressing the points that were raised by St. Paul's Council, three central points. Regarding the duty to defend, the question again is, what is alleged? In fact, the Inovac case addresses that directly. The Inovac case said, I do follow and agree with the Sony analysis, having been told that that was really the only case out there on point and not apparently considering Traveler's Research Portal Healthcare or others. But what the Inovac case said at the end is extraordinarily instructive here. If that case is so persuasive, it says, this is the duty to defend and there is nothing alleged within the complaint that the policyholder published the information. It's a complete contrast here. And beyond that, Keen, a case that Council for St. Paul cited, Mr. Spivak said, that case is controlling. But Keen says that the claimant makes no attempt to plead the fact creating coverage. There's nothing discussing whether the boat had under 40 horsepower, fewer than 40 horsepower. Here again, we're in the opposite situation. The demand letter actually does that. In the Don Buchwald case out of New York, the idea that Mr. Spivak says that there's a conspiracy to have published a videotape of what happened in a bedroom between two consenting adults to the public at large, to suggest that an entertainment agent would be in a conspiracy to publish a videotape like that, raises the question in terms of he's asking whether these allegations are credible, are those allegations credible, and yet the court found that enough to be sufficient for purposes of and rejected the exact language, the exact argument that was raised here, saying that the argument lacks merit because no requirement is expressed in the policy saying that the policyholder has to have taken action versus being liable for it. So with a minute left, two more points in terms of whether these policies could provide coverage and they could not possibly do so. The industry and St. Paul or travelers that sent the letter denying coverage on its letterhead has a data breach exclusion for future policies that was available by the time the second policy at issue in this case was written, and they also have written policies that are a hundred percent specific on the actions of the insured, saying that the coverage applies only when it's a negligent acts, errors, or omissions of the insured that's been around for over 40 years available to them to use here. And so they could have written the policies to include that, those exclusions, or that specific language they chose not to. Did you say that exclusion has been in vogue? I'm sorry, Your Honor, the data breach exclusion? Yes. That exclusion was written by the Insurance Services Office in 2013, and Travelers was able to have submitted and approved in advance of the 2015 insurance policy that's at issue here. I see that I'm out of town. Thank you, Your Honors. Thank you, Counsel. Our next case is Kearney Constructions.